**Hand-Delivered**

FILED
CHARLOTTE, NC

JUL 2 1 2023

US DISTRICT COURT
WESTERN DISTRICT OF NC

United States District Court

Western District of North Carolina

KEVIN RAY REECE

Plaintiff,

vs.

THOMAS HORNER A/K/A TOM HORNER

MATTHEW DAVID LEACH A/K/A/ MATT LEACH

LEE B. BOLLINGER                       Complaint

CHRIS LAWS                            Case No. 5:23CV116 - KDB

JOSHUA HAWKS A/K/A JOSH HAWKS

BOB SCHURMEIER

Defendants.

**Jury Trial Demanded**

### A. Jurisdiction

1. This Court has federal question jurisdiction because all of the following causes of action, except Claim VII, arise under 42 U.S.C. § 1983, civil conspiracy to violate that statute, and failure to intervene to stop a violation of that statute.  28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over Claim VII because that North Carolina tortious interference claim is so related to the other claims in this action, particularly Claim V, that it forms part of the same case or controversy under Article III of the United States Constitution.  28 U.S.C. § 1367(a).

### B. Venue

3. This Court is a proper venue under 28 U.S.C. § 1391(b)(1) because all of the defendants are residents of North Carolina, and the defendants Thomas Horner, Matthew Leach, and Lee Bollinger are residents in the Western District of North Carolina.

1

4. This Court is also a proper venue under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this suit occurred in the Western District of North Carolina.

## C. Parties

5. Plaintiff: Kevin Reece
   Address: 685 Factory Street
   Ronda, NC 28685

6. Defendant: Thomas Horner
   Address: 500 Courthouse Drive
   Suite 2022
   Wilkesboro, NC 28697
   Is employed as District Attorney at North Carolina Prosecutorial District 34

7. Defendant: Matthew Leach
   Address: 500 Courthouse Drive
   Suite 2022
   Wilkesboro, NC 28697
   Is employed as Assistant District Attorney at North Carolina Prosecutorial District 34

8. Defendant: Lee B. Bollinger
   Address: 500 Courthouse Drive
   Suite 2022
   Wilkesboro, NC 28697
   Is employed as Assistant District Attorney at North Carolina Prosecutorial District 34

9. Defendant: Chris Laws
   Address: 279 Performance Drive
   Hickory, NC 28602
   Is employed as Senior Agent in Charge of the North Carolina State Bureau of Investigation

10. Defendant: Joshua Hawks
    Address: 279 Performance Drive

2

Hickory, NC 28602

Is employed as Agent at North Carolina State Bureau of Investigation

11. Defendant: Bob Schurmeier

    Address:    3320 Garner Road

                Raleigh, NC 27610

    Is employed as Director of the North Carolina State Bureau of Investigation

### D.  Factual Allegations

12. This case began as a civil dispute that transformed over the course of five years into a criminal matter that the state handled so poorly that the defendants committed numerous tortious violations of Kevin Reece's rights.

13. On September 20, 2018, Debra Goldman, Mr. Reece's girlfriend at the time, filed a theft report with the Wilkes County Sheriff's Office relating to a diamond ring ("the ring").

14. Wilkes County Sheriff Officer Jason Adams interviewed Ms. Goldman in Mr. Reece's home about the alleged theft on September 20.

15. Mr. Reece was not present during the September 20 interview.

16. On a later date, Ms. Goldman filed an insurance claim with USAA related to this alleged theft because the ring was covered by her insurance policy.  Ms. Goldman was the sole policyholder, and Mr. Reece had nothing to do with the policy.

17. Mr. Reece has maintained that Ms. Goldman sold the ring to him and that it was never stolen or went missing.

18. In addition, Mr. Reece has evidence supporting his claim of ownership including an affidavit by Kevin Slusher, manager of a Windsor Jewelers location in Winston-Salem, that reports that Mr. Reece and Ms. Goldman came to his location to get the ring appraised pursuant to Mr. Reece and Ms. Goldman's plan for Ms. Goldman to sell the ring to Mr. Reece.

19. That appraisal was conducted in Mr. Reece's name, and Mr. Reece paid for it.

20. Mr. Reece has a slip containing two signatures, one for delivering the ring to Windsor Jewelers and one for retrieving it after the appraisal.

21. Mr. Slusher emailed and mailed the appraisal to Mr. Reece on March 8, 2018.

3

22. When Ms. Goldman moved out of Mr. Reece's home on August 2, 2020, she took Mr. Reece's hard drives containing old family photos of Mr. Reece's children and deceased wife, as well as a Rolex watch. Ms. Goldman mistakenly left behind a different ring in a closet ("the abandoned ring").

23. Mr. Reece later found the abandoned ring and, in text messages with Ms. Goldman, Mr. Reece said he would return it if Ms. Goldman returned the property she took when she left.

24. Early in January of 2022 Officer Adams called Mr. Reece and informed Mr. Reece that he was looking for the ring that Ms. Goldman had reported stolen in 2018. Officer Adams asked for and acquired Mr. Reece's consent to stop by his house and look for it.

25. Mr. Reece fully cooperated with the search.

26. Before Officer Adams's arrival, Mr. Reece placed all of the jewelry in his possession on the dining room table for Officer Adams to inspect. The jewelry was in various boxes, pouches, and bags, as well as some loose items not in containers.

27. When Officer Adams arrived, he came with Wilkes County Sheriff Officer William Bishop.

28. Officer Adams did not perform a thorough inspection. He performed a brief visual inspection, did not open the containers, and did not search the rest of Mr. Reece's home.

29. Therefore, no other jewelry was found in Mr. Reece's home at that time.

30. During the meeting, Mr. Reece handed the abandoned ring over to Officer Adams. Mr. Reece told Officer Adams, in Officer Bishop's presence, that he was giving the abandoned ring over because Mr. Reece said that it was abandoned in his home, that he knew it was not his, and that he thought it belonged to Ms. Goldman, but was unsure who exactly owned it.

31. Officer Adams later affirmed to Mr. Reece in a phone call on or about September 6, 2022, that he did not look through Mr. Reece's house aside from performing the aforementioned brief visual inspection, as well as telling Mr. Reece that he had told "them" about the extent of the search and that he could not testify that Mr. Reece had failed to place all of the jewelry in his home on the table for inspection.

4

32. Upon information and belief, the "them" most likely referred to the SBI and/or DA Horner's office.

33. Further, Officer Adams's case notes in the discovery file state that he did a brief visual inspection and that he did not pick up every item.

34. Upon information and belief, Officer Adams questioned Ms. Goldman during this investigation, and Ms. Goldman told him that she was holding onto the hard drives and Rolex as collateral to get "a ring" back from Mr. Reece, without specifying which ring.

35. Upon information and belief, Ms. Goldman was unhappy, for whatever reason, with the Wilkes County Sheriff's Office investigation and reported to the office of District Attorney Thomas Horner ("DA Horner") on January 11, 2022, that Mr. Reece had the ring at issue, leading DA Horner to contact the North Carolina State Bureau of Investigation ("SBI").

36. Ms. Goldman's report contained information suggesting the ring was at Mr. Reece's home.

37. Senior Agent in Charge Chris Laws supervised the SBI's investigation, being apprised of information relating to the case by being copied on documents.

38. On January 26, 2022, Agent Joshua Hawks arrived at Mr. Reece's home, telling him that he had a search warrant to look for the ring and that agents were waiting outside to execute the warrant if Mr. Reece did not consent to the search.

39. Mr. Reece consented to the search, and Agent Hawks seized the ring after identifying it as the ring subject to Ms. Goldman's insurance claim and with Mr. Reece's consent. Even while consenting to the seizure, Mr. Reece clearly stated that the ring was his.

40. On various dates, Mr. Reece, through counsel, acquired affidavits from Slusher, Dylan Riddick, and Andrew Wood, which all supported his claim of ownership. Through counsel, Mr. Reece furnished these affidavits to Agent Hawks.

41. On February 26, 2022, Agent Hawks prepared a synopsis of the case for DA Horner, in which he referenced Mr. Reece's three affidavits. Agent Hawks's synopsis reflected that no investigative work had been undertaken, aside from conducting

5

background checks on law enforcement databases, taking the ring, receiving Mr. Reece's affidavits, and interviewing Mr. Reece and Ms. Goldman.

42. The face of the synopsis reveals that the dispute was a he said/she said, with only Mr. Reece's side being supported by evidence.

43. On April 14, 2022, DA Horner told Agent Hawks that he had chosen to furnish the ring to USAA and was declining to prosecute Mr. Reece.

44. On April 18, North Carolina Commander Joshua Falls emailed a senior property adjuster for USAA, Ashley Gosline, and copied Agent Hawks. In that email, Commander Falls wrote that the ring would need to be "returned to a USAA representative who can verify that [the ring] [wa]s the ring that an insurance payment was made on and who could personally take possession of the ring."

45. On April 19, Ms. Gosline wrote to Agent Hawks that USAA was seeking an expert to verify that the ring was the same ring covered by Ms. Goldman's insurance policy. To date, Mr. Reece has no evidence that any expert ever performed such a verification for USAA.

46. On April 29, Agent Hawks met with USAA Investigator Eric Lewis and turned the ring over to him.

47. On or around May 8, 2022, Mr. Reece called SBI Director Bob Schurmeier to voice his concerns about not being treated fairly, and Director Schurmeier informed Mr. Reece that he would get an assistant director to contact Mr. Reece or arrange a meeting between Mr. Reece and an assistant director to address Mr. Reece's concerns.

48. To be particular about the concerns Mr. Reece shared, he worried that Ms. Goldman was abusing the SBI to harm Mr. Reece and that she was succeeding in manipulating the SBI.

49. Mr. Reece also shared particular facts, known to him, concerning why Ms. Goldman would have undue influence over the SBI, including Ms. Goldman's connections to then-current and former political power players in Washington politics, as well as Wake County/Raleigh Republican politics.

50. Mr. Reece shared his belief that Ms. Goldman had blackmail on Kieren Shanahan, a Republican former Secretary of the North Carolina Department of Public Safety,

whom Mr. Reece suspected has leftover influence over the SBI due to his former status.

51. Mr. Reece further shared with Director Schurmeier that Ms. Goldman had blackmail on Wayne King, former Vice Chairman of the North Carolina Republican Party and former Deputy Chief of Staff to Congressman Mark Meadows.

52. Mr. Reece told Director Schurmeier that he suspected that Mr. King had influence over the SBI due to his high positions in Raleigh and Washington politics and because Mr. King was connected to Mr. Meadows, who was President Donald Trump's chief of staff from March of 2020 to January of 2021.

53. Mr. Reece shared that Ms. Goldman had blackmail on then-Cary City Councilman Don Frantz (now Cary Mayor Pro Tempore), a Republican.

54. Mr. Reece voiced his suspicion that Councilman Frantz, as an elected Republican in the Raleigh/Cary area, could influence the SBI.

55. Lastly, Mr. Reece shared that Ms. Goldman had influence over Chris Malone, a former Wake County Board of Education Member and former North Carolina Representative. Mr. Reece stated that as a Republican in Wake County and Raleigh politics, Representative Malone would have influence over the SBI.

56. Mr. Reece shared that Ms. Goldman had told Mr. Reece that she has recordings of former North Carolina Republican Party Chairman, Claude Pope, Junior, and, given her conduct and influence over other people, Mr. Reece stated his concern that Ms. Goldman might have had influence via Chairman Pope as well.

57. After sharing these concerns, Director Schurmeier told Mr. Reece that he would get an "assistant director" in contact with Mr. Reece.

58. Director Schurmeier remained polite throughout that phone call and later text messages.

59. On or around May 20, 2022, Director Schurmeier reached back out to Mr. Reece, stating that he would get Senior Agent Laws to contact Mr. Reece.

60. Director Schurmeier got Senior Agent Laws involved despite Senior Agent Laws being one of the subjects of Mr. Reece's complaints.

61. Within a few days of this conversation, Senior Agent Laws called Mr. Reece with an angry and aggressive tone. He admonished Mr. Reece for contacting Schurmeier,

saying that he had no idea how Mr. Reece acquired Schurmeier's contact information and that Mr. Reece had "better not call the director again."

62. Around this time, a long-term acquaintance of Mr. Reece's reached out to Commander Falls. Upon information and belief, the fact of the conversation and its details reached DA Horner, and the details of the conversation and the identity of this acquaintance are material to this case because of their effect on DA Horner.

63. Mr. Reece retained Attorney Bob Laws in order to recover the ring from USAA.

64. In early June, Mr. Laws sent a letter to USAA demanding that USAA return the ring and warned USAA that Mr. Reece would sue to get it back if USAA failed to return it. Mr. Laws also stated in the letter that the NCSBI had wrongfully turned over the ring to USAA, and that the NCSBI had not done a thorough investigation.

65. On June 1, 2022, Mr. Reece hired Venus "Beanie" Taylor to ghostwrite a book about Mr. Reece's experiences with the criminal justice system.

66. Sometime later, Taylor informed Mr. Reece that she had emailed DA Horner seeking an interview for a book titled *Political Primer* and that DA Horner never wrote back.

67. Also in June, Mr. Reece met with Wilkes County Sheriff, Chris Shew, in the presence of Officer Adams.

68. Mr. Reece told Sheriff Shew that he was upset about how he was being treated, especially with the ring being taken from him and furnished to a third party without any due process. He requested that Shew help him recover the ring and gave him a packet of documents relating to the case.

69. Mr. Reece included a copy of Mr. Laws's letter to USAA and accidentally included a copy of his ghostwriting contract with Taylor.

70. Specifically, Mr. Reece asked that the ring be returned or, at least, to ensure that there would be a hearing so that he could put forward evidence for a judge to determine possession of the ring.

71. As for that second option, Mr. Reece was contemplating the State calling a hearing under N.C.G.S. § 15-11.1(a) before the judge to determine whether the ring should be returned to Mr. Reece as an item "no longer useful or necessary as evidence in a criminal trial."

72. According to Mr. Laws, Sheriff Shew took Mr. Reece's packet to DA Horner.

8

73. Furthermore, Mr. Laws's letter and the ghostwriting contract appeared in Mr. Reece's discovery file for the criminal case against Mr. Reece. Unlike other discovery documents, these documents omit how the State acquired them or who entered them into the discovery by omitting the header. The documents only state that Mr. Reece provided them.

74. Around June of 2022, Mr. Reece learned, upon information and belief, that DA Horner and Assistant District Attorney Lee Bollinger ("ADA Bollinger") despised his relationship with Ms. Goldman.

75. Mr. Laws and DA Horner had several telephonic and letter correspondences relating to the ring.

76. In these conversations, DA Horner told Mr. Laws that he had sent the ring to USAA because he did not know whether to believe Mr. Reece or Ms. Goldman.

77. DA Horner threatened Mr. Laws that Mr. Reece would be prosecuted if Mr. Reece filed any claims against USAA for the return of the ring.

78. DA Horner made this threat after Mr. Laws expressed his opinions that he disagreed with DA Horner's decision to send the ring to USAA in the way that he did and that the better courses of action would have been to return the ring to Mr. Reece and let USAA sue him for it.

79. Following DA Horner's threat, Mr. Reece refrained from filing a lawsuit against USAA out of fear of prosecution.

80. On June 29, DA Horner emailed Mr. Laws, writing "Based upon information recently provided by law enforcement, we cannot rule out the strong potential for criminal charges." That email contained the seal of North Carolina's General Court of Justice.

81. Additionally, DA Horner wrote to Mr. Laws that if Mr. Reece satisfied USAA, that would factor into his charging decisions.

82. Mr. Laws made a settlement offer to USAA in which Mr. Reece would pay the amount of any legal fees that would be incurred in litigating ownership in exchange for USAA returning the ring.

83. Upon information and belief, DA Horner's office made separate communications with USAA during these settlement negotiations. ADA Leach contacted them via

9

email, ADA Bollinger contacted them by phone, and DA Horner contacted them at least once.

84. Further, Agent Hawks also engaged in separate communications with USAA at this time.

85. During the settlement negotiations, sometime in June, Mr. Reece contacted a USAA representative under the advice of Mr. Laws because Mr. Laws had not been able to contact anyone from USAA and Mr. Laws felt that Mr. Reece reaching out to them would have a higher chance of success.

86. Mr. Reece told this representative that Mr. Reece and Mr. Laws were hoping to resolve the property issue with USAA because DA Horner had said that it would "satisfy" the prosecution if USAA was satisfied.

87. When Mr. Reece relayed that information, the representative responded, with a confused tone of voice, "They told you that?"

88. In other conversations with Mr. Laws, ADA Bollinger said that DA Horner was putting pressure on ADA Bollinger to "do something" about the ring case.

89. Around the end of August, Assistant District Attorney Lee Bollinger told Mr. Laws that his father had passed away, he would be out of town, and that nothing would happen with Mr. Reece's case until he returned and had further discussion with Mr. Laws about Mr. Laws's efforts to settle the ring matter with USAA.

90. In that conversation, Mr. Laws told ADA Bollinger that he believed that he and Mr. Reece were about to settle the matter with USAA.

91. ADA Bollinger agreed to "hold off" DA Horner until he returned to town and discussed the matter with Mr. Laws further.

92. Pursuant to that agreement, Mr. Laws waited for Bollinger to return and discuss the matter further.

93. Then, on September 6, 2022, Horner's office secured grand jury indictments ("September indictments") against Mr. Reece for felony possession of stolen goods and multiple counts of felony common law obstruction of justice.

94. ADA Bollinger tried to contact Mr. Laws several times that day and, when he finally reached Mr. Laws on the phone, he told him that someone else was securing grand jury indictments.

10

95. Upon information and belief, Assistant District Attorney Matthew Leach ("ADA Leach") prepared the indictments, as opposed to just signing them.

96. Two of the felony possession of stolen goods charges stated that Mr. Reece had not placed the ring on the table for inspection at the time of Officer Adams's and Officer Bishop's search, and that the ring was somewhere else in the house, but that indictment was not supported due to Officer Adams's assurance that he did not look through the jewelry or Mr. Reece's house.

97. Pursuant to the September indictments, Agent Hawks arrested Mr. Reece, and Mr. Reece was processed by the Wilkes County jail before posting bail.

98. Later that September, Agent Hawks served a search warrant on Lisa Wall, CPA, for Ms. Goldman and Mr. Reece's 2018 taxes and conducted a recorded interview with Wall's consent.

99. The recorded interview with Ms. Wall was not included in the discovery provided to Mr. Reece.

100. Also, in September, Ms. Goldman was part of a lengthy interview conducted by Agent Hawks and SBI Special Agent Justin Stovall, in which she made false statements making Mr. Reece look guilty. However, she further admitted that the ring had not been stolen back in September of 2018, but that she had decided to include it in the list of stolen items anyway.

101. In that interview, Ms. Goldman admitted that she committed insurance fraud alone and without anyone else.

102. After that admission, Agent Hawks and Special Agent Stovall pushed Ms. Goldman to implicate Mr. Reece.

103. Lastly, Agent Hawks remarked that Ms. Goldman helped the SBI build the case against Mr. Reece and that most of his and Special Agent Stovall's opinions came from Ms. Goldman.

104. On October 31, 2022, DA Horner's office secured a grand jury indictment ("October indictment") for insurance fraud.

105. The insurance fraud indictment alleged that Mr. Reece was present on September 20, 2018, when Officer Adams interviewed Ms. Goldman and assisted Ms. Goldman in

11

committing insurance fraud by failing to correct her fraudulent statements, even though Mr. Reece was not present that day.

106. Assistant District Attorney Matthew Leach called Agent Hawks to testify at this hearing.

107. On the same day as the October grand jury proceeding, either before or after the proceeding, Officer Adams told Agent Hawks that Mr. Reece was not present on September 20, 2018, when Officer Adams interviewed Ms. Goldman about the alleged theft.

108. Notwithstanding Officer Adams informing Agent Hawks to the contrary, the indictment specified that Mr. Reece was present when Officer Adams interviewed Ms. Goldman.

109. Agent Hawks has done nothing to correct this false testimony.

110. Pursuant to these October indictments, Mr. Reece was arrested and processed by the Wilkes County jail before posting an unsecured bond.

111. Ms. Goldman was later charged with insurance fraud and felony common law obstruction of justice.

112. Ms. Goldman's proceedings are still ongoing.

113. On March 29, 2023, Mr. Reece made an *Alford* plea in Superior Court to two counts of felony common law obstruction of justice.

114. Pursuant to North Carolina's requirement that a guilty plea must have a factual basis, *see generally* N.C.G.S. § 15A-1023(c); *State v. Chandler*, 376 N.C. 361, 367 (2020), Assistant District Attorney Lee Bollinger presented the factual basis to the judge.

115. ADA Bollinger's presentation of the factual basis contained numerous factual errors.

116. ADA Bollinger misstated the search that Officer Adams conducted by stating that Officer Adams picked up every piece of jewelry, even though Officer Adams has consistently said that he did only a brief visual inspection and did not pick up each piece of jewelry.

117. ADA Bollinger misstated that Agent Hawks, when conducting the January 2022 search, opened the safe and retrieved the ring from a box on the top shelf of the safe, even though Mr. Reece opened the safe for Agent Hawks, retrieved the ring from a

green origami bag, and handed it to Agent Hawks alongside other jewelry from the safe to look through.

118. ADA Bollinger falsely stated the timeline of events surrounding Ms. Goldman's insurance claim and meeting with Officer Adams.

119. ADA Bollinger misstated the date of Ms. Goldman's departure from Ronda as July, rather than August 2 of 2022.

120. ADA Bollinger said that Ms. Goldman made a police report in May of 2018 and that police conducted interviews of suspects in May of 2018.

121. Neither that report nor those interviews were included in discovery.

122. Upon information and belief, that report and those interviews never took place.

123. ADA Bollinger discussed a FaceTime video recording in March of 2020, as well as numerous other FaceTime recordings.

124. If those other FaceTime recordings exist, only one of them, a recording from December of 2021, was provided in discovery.

125. ADA Bollinger stated that Agent Hawks showed Mr. Reece various clear photos of the ring in an SBI interview even though those were blurry photographs.

126. Additionally, ADA Bollinger stated that a blurry screenshot of Mr. Reece holding a ring did not come from Ms. Goldman's screenshotting a FaceTime conversation, but a photograph that came from Mr. Reece.

127. Furthermore, ADA Bollinger conflated the abandoned ring with the ring subject to the theft report USAA claim.

128. Following the plea, the Court entered judgment on two of the obstruction of justice offenses.

129. Under that plea deal, the other charges against Mr. Reece were dropped.

130. Since then, an SBI internal affairs investigation has started pursuant to an April 13, 2023 report.

131. Special Agent William Marsh has been assigned to handle the investigation.

132. Special Agent Marsh has informed Mr. Reece that the recording of the interview with Ms. Wall is in the SBI's internal file.

133. At a later date, Mr. Reece had a telephone conversation with SBI General Counsel Angel Gray.

134. In that conversation, Mr. Reece asked to compare the SBI internal file to the file that Mr. Reece received through discovery.

135. Counsel Gray told Mr. Reece that she would have to get that authorized by Director Schurmeier.

136. On June 20, Counsel Gray texted Mr. Reece that she had spoken with Director Schurmeier and that he did not agree to allow Mr. Reece to review the SBI's criminal investigative file.

137. Previous to the main facts of this case, Senior Agent Laws had requested to interview Mr. Reece about a criminal matter in the courthouse just after Mr. Reece had made an *Alford* plea.

138. Mr. Reece declined to give that interview.

139. Upon information and belief, Mr. Reece avers that Senior Agent Laws was hoping to get a big catch in the form of two high-ranking state judicial officials and one high-ranking state executive official.

140. Ryan Ward, LCMHC, has been Kevin's mental health counselor from around 2012 or 2013 to the present day.

141. Mr. Ward will testify that Mr. Reece's has developed PTSD and/or other related trauma-induced disorders from this ordeal.

142. Mr. Ward will further testify that Mr. Reece's PTSD and/or other related trauma-induced disorders manifests in numerous ways, including getting fearful around the middle of each month because Mr. Reece knows that the grand jury meets at that time, getting afraid every time Mr. Reece sees a police car, and being afraid to mow the lawn for fear that an officer will arrest him while outdoors.

143. Mr. Reece has spent over $30,000 in legal fees throughout this ordeal.

144. Mr. Reece is a citizen of the United States of America.

14

## E. Claim I

### DA Horner Deprived Mr. Reece of the Rights to Property and Due Process in Violation of 1983

145. Mr. Reece restates and realleges paragraphs 1-144 as though stated herein.

146. Section 1983 of Title 42 of the United States Code provides, in relevant part, that "Every person who, under color of any statute, . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."

147. Section One of the Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deprive any person of life, liberty, or property, without due process of law."

148. A plaintiff may recover punitive damages under Section 1983 if the plaintiff shows that the defendant was intentional, malicious, or acted with reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983).

149. A plaintiff may recover emotional distress damages for a 1983 violation if the plaintiff shows that he suffered emotional distress and that the emotional distress actually resulted from the constitutional violation itself. *See Carey v. Piphus*, 435 U.S. 247, 263–64 (1978); *Knussman v. Maryland*, 272 F.3d 625, 639–40 (4th Cir. 2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).

150. Distress includes mental suffering and emotional anguish, which a plaintiff may show by evidence of his own conduct that is observed by others. *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978).

151. Mr. Reece is a citizen of the United States.

152. DA Horner acted under color of law and statute by committing these actions in his official capacity as the District Attorney for North Carolina Prosecutorial District 34.

153. As an elected state official, DA Horner's actions in violating Mr. Reece's rights to property and due process violated Section One of the Fourteenth Amendment.

154. The ring was seized, in part, so that USAA could perform a verification to determine whether it was the ring subject Ms. Goldman's insurance claim. However, no verification appears to have taken place.

155. Furthermore, DA Horner told Mr. Laws that he gave the ring to USAA because he did not know whether to believe Mr. Reece or Ms. Goldman's claims to the ring.

156. Thus, DA Horner deprived Mr. Reece of his rights to property and due process by taking the ring for longer than was necessary for the SBI investigation or a USAA verification, as evidenced by him furnishing the ring to USAA well before filing charges and around the same time that he made statements to Mr. Laws that he was unsure about filing charges.

157. DA Horner also violated Mr. Reece's right to due process in threatening Mr. Reece (by telling Mr. Reece's counsel) that if Mr. Reece filed for return of the ring, DA Horner would file charges against him, which directly made Mr. Reece decline to exercise his due process right to seek a civil action for return of the property.

158. DA Horner's threat was so improper that the Court may infer that DA Horner's actions were intentional, malicious, or with reckless or callous indifference to Mr. Reece's rights to property and due process.

159. DA Horner's hatred for Mr. Reece's relationship with Ms. Goldman is another reason to infer intent, malice, or reckless and callous indifference.

160. Additionally, DA Horner violated Mr. Reece's due process rights by writing to Mr. Laws that Mr. Reece satisfying USAA would affect his charging decisions, while making separate communications to USAA, undermining the settlement process.

161. The irregularity of DA Horner's interference with the settlement negotiations is another reason to infer intent, malice, or reckless and callous indifference.

162. Thus, DA's Horner's actions violated the rights to property and due process secured by the Constitution, which constitutes a violation of 1983, and subjects him to liability to Mr. Reece.

163. Further, punitive damages are appropriate in this case as a result of DA Horner's intent, malice, and/or reckless and callous indifference.

164. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

165. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

166. Therefore, emotional distress damages are appropriate for this claim.

## F. Claim II

### In Violation of 1983, DA Horner, ADA Leach, and Agent Hawks Violated the Fourth Amendment by Imprisoning Him on the Basis of Falsified Evidence

167. Mr. Reece restates and realleges paragraphs 1-166 as though stated herein.

168. The elements of a 1983 claim are stated above in Claim I.

169. The requirements for punitive damages under 1983 are stated above in Claim I.

170. The requirements of an emotional distress claim are stated above in Claim I.

171. The Fourth Amendment to the United States Constitution prohibits unreasonable seizures.

172. The Fourth Amendment has been interpreted to prohibit arbitrary arrest, *Payton v. New York*, 445 U.S. 573, 585 (1980), improper detention, *see Burgess v. Goldstein*, 997 F.3d 541, 554 (4th Cir. 2021), and prosecuting someone on the basis of false evidence, *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

173. As an SBI Agent, Agent Hawks's misconduct in presenting false testimony to the October grand jury was an action under color of law.

174. As an assistant district attorney, ADA Leach's misconduct in presenting falsified evidence to the October grand jury was an action under color of law.

175. Agent Hawks knew that Mr. Reece was not present at the time of Officer Adams' interview with Ms. Goldman.

176. Despite this, the indictment states that Mr. Reece was present.

177. Mr. Reece's alleged presence was essential to prosecuting Mr. Reece. Without it, his allegation that Mr. Reece acted by omission was a legal impossibility, and Mr. Reece could not have been indicted, much less convicted.

178. Agent Hawks either had clear knowledge that this testimony was false and he presented it anyway or failed to correct it after learning that it was false.

179. Furthermore, Mr. Reece affirms, upon information and belief, that ADA Leach most likely knew that the testimony was false and presented the testimony anyway.

180. Additionally, upon information and belief, Mr. Reece affirms that DA Horner's involvement with the case makes it almost certain that he knew false evidence was to be used.

181. Thus, Agent Hawks, ADA Leach, and DA Horner all violated Mr. Reece's rights under the Fourth Amendment by knowingly presenting false evidence to a grand jury proceeding or, in DA Horner's case, by allowing it to be presented.

182. By violating the Fourth Amendment, Agent Hawks, ADA Leach, and DA Horner violated 1983.

183. Since Agent Hawks had actual knowledge that Mr. Reece was not present during the interview, his testimony to the contrary gives the Court enough evidence to infer that his false testimony or failure to correct it was intentional, malicious, or made with reckless or callous indifference to Mr. Reece's Fourth Amendment rights.

184. Furthermore, Agent Hawks's knowing presentation of false evidence creates an inference that DA Horner and/or ADA Leach also acted intentionally, maliciously, or with reckless or callous indifference.

185. Therefore, punitive damages are appropriate for DA Horner, ADA Leach, and Agent Hawks.

186. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

187. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

188. Therefore, emotional distress damages are appropriate for this claim.

19

## G. Claim III

DA Horner, ADA Leach, and Agent Hawks All Committed a Civil Conspiracy Under 1983 to Commit Claim II

189. Mr. Reece restates and realleges paragraphs 1-188 as though stated herein.

190. The elements of a 1983 claim are stated above in Claim I.

191. The requirements for punitive damages under 1983 are stated above in Claim I.

192. The requirements of an emotional distress claim are stated above in Claim I.

193. A civil conspiracy under 1983 requires proof of a meeting of the minds between the defendants to deprive the plaintiff of a constitutional right and an overt act in furtherance of the conspiracy. *Willis v. Blevins*, 966 F. Supp. 2d 646, 660 (E.D. Va. 2013) (citing *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996)).

194. DA Horner, ADA Leach, and Agent Hawks each conspired to deprive Mr. Reece of his Fourth Amendment rights.

195. Their conspiracy can be inferred from the following facts: ADA Leach's status as an assistant district attorney under DA Horner and the successful presentation of the false testimony.

196. Additionally, ADA Leach calling of Agent Hawks to testify and Hawks making the false testimony are overt acts in furtherance of the conspiracy.

197. Thus, DA Horner, ADA Leach, and Agent Hawks are all liable for civil conspiracy to violate 1983 consisting of presenting false evidence to the grand jury to deprive Mr. Reece of his Fourth Amendment rights.

198. Given the grounds to infer intent, malice, or reckless and callous disregard of Mr. Reece's Fourth Amendment rights discussed in Claim II, the Court has enough evidence to infer that this conspiracy was entered intentionally, maliciously, or with reckless or callous indifference to Mr. Reece's Fourth Amendment rights.

199. Therefore, punitive damages are appropriate against DA Horner, ADA Leach, Agent Hawks.

200. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

20

201. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

202. Therefore, emotional distress damages are appropriate for this claim.

## H. Claim IV

**In Violation of 1983, DA Horner Violated Mr. Reece's Right to Freedom of Speech by Pursuing This Prosecution to Retaliate for Mr. Reece's Plans to Have a Book Written About His Experiences with the Criminal Justice System**

203. Mr. Reece restates and realleges paragraphs 1-202 as though stated herein.

204. The elements of a 1983 claim are stated above in Claim I.

205. The requirements for punitive damages under 1983 are stated above in Claim I.

206. The requirements of an emotional distress claim are stated above in Claim I.

207. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech."

208. Under the Fourteenth Amendment, no state can restrict the right of freedom of speech. *Stromberg v. California*, 283 U.S. 359, 368 (1931).

209. Mr. Reece's ghostwriting contract with Taylor for a book about his experiences with the criminal justice system appeared in his discovery file concerning the criminal prosecutions against Mr. Reece.

210. Therefore, the Court may infer that Mr. Reece accidentally included the contract in the packet of documents he handed to Sheriff Shew and that Sheriff Shew gave to DA Horner.

211. Further, Taylor emailed Horner requesting an interview for a book.

212. Within the same month as Mr. Reece signing the ghostwriting contract and accidentally furnishing it to DA Horner, as well as Taylor's email, DA Horner changed his stance from declining to file charges to emailing Mr. Laws that there was a "strong potential for criminal charges" in an email containing the seal of North Carolina's General Court of Justice.

213. Given this timeline, the Court may infer that DA Horner's change of heart did not come from new substantive evidence, but rather a fear that Mr. Reece's constitutionally protected speech would harm his image and a resulting desire to silence Mr. Reece.

214. DA Horner's actions, therefore, infringed on Mr. Reece's right to free speech.

215. Therefore, DA Horner, under color of law, violated a right secured by the Constitution of the United States by pursuing this prosecution.

216. In addition, DA Horner's motivation to protect his reputation based on Mr. Reece's right to freedom of speech creates an inference that he acted intentionally, maliciously, or with reckless indifference to Mr. Reece's right to freedom of speech.

217. DA Horner's hatred for Mr. Reece's relationship with Ms. Goldman is another reason to infer intent, malice, or reckless and callous indifference.

218. Therefore, punitive damages are appropriate against DA Horner.

219. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

220. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

221. Therefore, emotional distress damages are appropriate for this claim.

## I.   Claim V

**In Violation of 1983, DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks All Violated Mr. Reece's Right to Freedom of Speech and Due Process by Attempting to Thwart Mr. Reece's Efforts to Settle the Ring Matter with USAA**

222. Mr. Reece restates and realleges paragraphs 1-221 as though stated herein.

223. The elements of a 1983 claim are stated above in Claim I.

224. The requirements for punitive damages under 1983 are stated above in Claim I.

225. The requirements of an emotional distress claim are stated above in Claim I.

226. The relevant protections of the First Amendment are stated above in Claim IV.

227. As discussed above, the Court may infer that DA Horner was afraid that Mr. Reece's exercise of his right to free speech would damage DA Horner's reputation.

228. DA Horner's office communicated with USAA apart from Mr. Reece and Mr. Laws while Mr. Reece and Mr. Laws were engaged in settlement negotiations with USAA.

229. DA Horner had stated that Mr. Reece's ability to settle the matter with USAA would factor into his charging decisions.

230. Therefore, the Court may infer that the communications to USAA by DA Horner's office were made to thwart Mr. Reece's ability to settle the matter with USAA and, by doing this, to force Mr. Reece into the binary choice of giving up his ownership of the ring or face criminal prosecution.

231. When Mr. Reece shared with a USAA representative that satisfying USAA would satisfy the prosecution, she responded with a confused tone, saying "They told you that?"

232. Her confusion at this request allows this Court to infer that the prosecution's statement to Mr. Reece was improper.

233. Further, her confusion allows this Court to infer that DA Horner, ADA Bollinger, ADA Leach, and Agent Hawks had indicated that they did not want USAA to settle the matter with Mr. Reece.

234. Her confusion also allows an inference that DA Horner, ADA Bollinger, ADA Leach, and Agent Hawks indicated that settling with Mr. Reece could lead to adverse legal action against USAA.

235. DA Horner was in no position to force Mr. Reece into this position, especially not out of fear of reputational harm.

236. Therefore, DA Horner, under color of law, deprived Mr. Reece of his right to free speech by acting in a retaliatory fashion in hampering Mr. Reece's settlement negotiations.

237. Furthermore, DA Horner's actions in conducting needless and irregular communications with USAA gives this Court reason to infer that he did so intentionally, maliciously, or with reckless and callous indifference to Mr. Reece's right to freedom of speech and due process.

238. Therefore, punitive damages are appropriate against DA Horner.

239. Additionally, Agent Hawks engaged in communications of his own.

240. This Court may infer that Agent Hawks knew of Mr. Reece and Mr. Laws' attempts to settle the matter with USAA

241. Given that inference that DA Horner acted with intent, malice, or reckless and callous indifference to Mr. Reece's right to freedom of speech and due process, this Court may infer that Agent Hawks's communications were also undertaken due to his intimate relationship to this case.

242. Therefore, punitive damages are appropriate against Agent Hawks.

243. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

244. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

245. Therefore, emotional distress damages are appropriate for this claim.

25

## J.  Claim VI

### In Violation of 1983, DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks All Committed a Civil Conspiracy to Commit Claim V

246. Mr. Reece restates and realleges paragraphs 1-245 as though stated herein.

247. The elements of a 1983 claim are stated above in Claim I.

248. The requirements for punitive damages under 1983 are stated above in Claim I.

249. The requirements of an emotional distress claim are stated above in Claim I.

250. The relevant protections of the First Amendment are stated above in Claim IV.

251. As discussed above, the Court may infer that DA Horner was afraid that Mr. Reece's exercise of his right to free speech would damage DA Horner's reputation.

252. The fact of the communications from DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks all communicated with USAA during these settlement negotiations allows this Court to infer that they conspired to violate Mr. Reece's rights.

253. Furthermore, DA Horner's actions in conducting needless and irregular communications with USAA gives this Court reason to infer that the parties entered into the conspiracy intentionally, maliciously, or with reckless and callous indifference to Mr. Reece's right to freedom of speech and due process.

254. Additionally, Agent Hawks engaged in communications of his own.

255. This Court may infer that Agent Hawks knew of Mr. Reece and Mr. Laws' attempts to settle the matter with USAA

256. Given that inference that DA Horner acted with intent, malice, or reckless and callous indifference to Mr. Reece's right to freedom of speech and due process, this Court may infer that Agent Hawks's communications were also undertaken due to his intimate relationship to this case.

257. Therefore, punitive damages are appropriate against Agent Hawks, DA Horner, ADA Leach, and ADA Bollinger.

258. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

26

259. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

260. Therefore, emotional distress damages are appropriate for this claim.

## K. Claim VII

### DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks All Committed Tortious Interference with Contract by Engaging in Separate Communications with USAA

261. Mr. Reece restates and realleges paragraphs 1-260 as though stated herein.

262. North Carolina tortious interference law governs this claim because this claim arose under North Carolina law. *See generally Erie R.R. Co. v. Thompkins*, 304 U.S. 64 (1938); *Felder v. Casey*, 487 U.S. 131, 151 (1988), *superseded by statute on other grounds by* 42 U.S.C. § 1997e(a), *as recognized in Higgason v. Stogsdill*, 818 N.E.2d 486, 488–90 (Ind. Ct. App. 2004).

263. Under North Carolina law, a plaintiff may recover for tortious interference with contract for damages incurred where the defendant "maliciously induces a person not to enter into a contract with another," where the person would have entered into the contract but for the defendant's interference. *Coleman v. Whisnant*, 225 N.C. 494, 506 (1945).

264. "Malice" for tortious interference refers to interfering with the purpose of injuring the plaintiff. *Coleman v. Whisnant*, 225 N.C. 494, 506 (1945).

265. A defendant making threatening communications to someone may constitute tortious interference with contract, especially if those conversations involve threats of adverse legal action. *See Coleman v. Whisnant*, 225 N.C. 494, 507 (1945).

266. Here, DA Horner's office, including ADA Leach, ADA Bollinger, and DA Horner, as well as Agent Hawks, made separate communications to USAA.

267. When Mr. Reece shared with a USAA representative that satisfying USAA would satisfy the prosecution, she responded with a confused tone, saying "They told you that?"

268. Her confusion at this request allows this Court to infer that the prosecution's statement to Mr. Reece was improper.

269. Further, her confusion allows this Court to infer that DA Horner, ADA Bollinger, ADA Leach, and Agent Hawks had indicated that they did not want USAA to settle the matter with Mr. Reece.

28

270. Her confusion also allows an inference that DA Horner, ADA Bollinger, ADA Leach, and Agent Hawks indicated that settling with Mr. Reece could lead to adverse legal action against USAA.

271. Mr. Laws's offer to USAA was reasonable under the circumstances, meaning USAA was highly likely to accept it.

272. Therefore, DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks intentionally interfered with Mr. Reece's attempt to enter a settlement contract with USAA under a reasonable offer that Mr. Laws made in order to injure Mr. Reece, and USAA would have entered into that settlement contract but for their interference because Mr. Laws's offer was reasonable.

273. Therefore, DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks committed tortious interference with contract under North Carolina law.

## L. Claim VIII

**In Violation of 1983, ADA Bollinger Violated Due Process and the Fourth Amendment by Presenting False Evidence at the *Alford* Hearing**

274. Mr. Reece restates and realleges paragraphs 1-273 as though stated herein.

275. The elements of a 1983 claim are stated above in Claim I.

276. The requirements for punitive damages under 1983 are stated above in Claim I.

277. The requirements of an emotional distress claim are stated above in Claim I.

278. The relevant protections of the Fourth Amendment are stated above in Claim II.

279. North Carolina requires that a guilty plea have a factual basis. *See generally* N.C.G.S. § 15A-1023(c); *State v. Chandler*, 376 N.C. 361, 367 (2020).

280. Where a state actor violates a due process protection created under state law, that violation also violates the Due Process Clause of the Fourteenth Amendment. *See North Carolina v. Pearce*, 395 U.S. 711, 723–25 (1969); *Blackledge v. Perry*, 417 U.S. 21, 28–29 (1974).

281. Furthermore, a state cannot prosecute someone on the basis of false evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

282. As an assistant district attorney presenting evidence at the March 2023 plea hearing, ADA Bollinger was acting under color of law.

283. ADA Bollinger presented numerous factual errors in the March 2023 plea hearing.

284. If ADA Bollinger had not made these factual errors, especially the errors concerning Officer Adams's and Agent Hawks's searches, it is likely that the court would not have found a factual basis and rejected the plea.

285. Therefore, Bollinger's presentation of false evidence violated Mr. Reece's right to due process under the Fourteenth Amendment by violating North Carolina's statutory protection requiring that a plea have a factual basis.

286. Thus, ADA Bollinger's presentation of false evidence violated Mr. Reece's rights under Due Process Clause and Fourth Amendment.

287. By violating Mr. Reece's due process while acting under color of law, ADA Bollinger is subject to liability under 1983.

30

288. Given that ADA Bollinger presented false evidence and had a hatred for Mr. Reece's relationship, this Court may infer that he did so intentionally, maliciously, or with reckless and callous indifference to Mr. Reece's Fourth Amendment rights.

289. Therefore, punitive damages are appropriate for ADA Bollinger.

290. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

291. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

292. Therefore, emotional distress damages are appropriate for this claim.

## M. Claim XI

DA Horner, ADA Bollinger, and ADA Leach All Committed a Civil Conspiracy Under 1983 to Commit Claim VIII

293. Mr. Reece restates and realleges paragraphs 1-292 as though stated herein.

294. The elements of a 1983 claim are stated above in Claim I.

295. The requirements for punitive damages under 1983 are stated above in Claim I.

296. The requirements of an emotional distress claim are stated above in Claim I.

297. The elements of civil conspiracy are stated above in Claim III.

298. DA Horner, ADA Bollinger, and ADA Leach each conspired to deprive Mr. Reece of his due process and Fourth Amendment rights described in Claim VIII.

299. Their conspiracy can be inferred from the following facts: ADA Bollinger's status as an assistant district attorney under DA Horner and the successful presentation of false information during the plea hearing.

300. As between ADA Leach and ADA Bollinger, the conspiracy can be inferred by the fact that both of them worked on the prosecution against Mr. Reece at different times.

301. Thus, DA Horner, ADA Leach, and Agent Hawks are all liable for civil conspiracy to violate 1983 consisting of presenting false evidence to the grand jury to deprive Mr. Reece of his Fourth Amendment rights.

302. Given ADA Bollinger's presentation of false evidence and hatred for Mr. Reece's relationship with Ms. Goldman, the Court may infer that ADA Bollinger, ADA Leach, and/or DA Horner acted intentionally, maliciously, or with reckless and callous indifference to Mr. Reece's Fourth Amendment rights in forming the civil conspiracy to commit Claim VIII.

303. Therefore, punitive damages are appropriate for this claim.

304. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

305. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

306. Therefore, emotional distress damages are appropriate for this claim.

## N.  Claim X

### In Violation of 1983, DA Horner Violated Mr. Reece's Due Process Rights By Interfering with Mr. Reece's Exercise of Rights Created Under North Carolina Law

307. Mr. Reece restates and realleges paragraphs 1-306 as though stated herein.

308. The elements of a 1983 claim are stated above in Claim I.

309. The requirements for punitive damages under 1983 are stated above in Claim I.

310. The requirements of an emotional distress claim are stated above in Claim I.

311. Article 89 of Chapter 15A the North Carolina General Statutes authorizes and defines motions for appropriate relief.

312. Where a state actor violates a due process protection created under state law, that violation also violates the Due Process Clause of the Fourteenth Amendment. *See North Carolina v. Pearce*, 395 U.S. 711, 723–25 (1969); *Blackledge v. Perry*, 417 U.S. 21, 28–29 (1974).

313. Mr. Reece had at least two grounds for a motion for appropriate relief.

314. The first ground was that the charges of felony common law obstruction of justice could not be applied to Mr. Reece's alleged conduct because it overlapped with N.C.G.S. § 14-223(a), meaning that felony common law obstruction of justice had been abrogated insofar as it applied to Mr. Reece and could not have supported a cause of action. *See* N.C.G.S. § 15A-1414(b).

315. The second ground was that ADA Bollinger's false statements during the *Alford* hearing made the plea lack a factual basis, rendering his conviction and sentence invalid. *See* N.C.G.S. § 15A-1414(b)(2), (4).

316. Thus, DA Horner, by communicating threats to Mr. Reece about him exercising his legal rights as to recovering the ring made Mr. Reece fearful that if he exercised his statutory right to seek a motion for appropriate relief, then DA Horner would retaliate by recharging Mr. Reece.

317. Such a decision would have violated Mr. Reece's rights to Due Process. *Cf. North Carolina v. Pearce*, 395 U.S. 711, 723–25 (1969).

33

318. Therefore, DA Horner's threat violated Mr. Reece's right to Due Process by interfering with his free exercise of a procedural protection afforded to him under North Carolina law.

319. Thus, DA Horner's action under color deprived Mr. Reece of his right to Due Process in violation of Section 1983.

320. As with Claim I, DA Horner's threat and hatred for Mr. Reece's relationship with Ms. Goldman allows the Court to infer that he acted intentionally, maliciously, or with reckless and callous indifference to Mr. Reece's Due Process rights.

321. Therefore, punitive damages are appropriate for this claim.

322. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

323. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

324. Therefore, emotional distress damages are appropriate for this claim.

34

## O.  Claim XI

### Director Schurmeier Violated 1983 by Failing to Intervene

325. Mr. Reece restates and realleges 1-324 as though stated herein.

326. The elements of a 1983 claim are stated above in Claim I.

327. The requirements for punitive damages under 1983 are stated above in Claim I.

328. The requirements of an emotional distress claim are stated above in Claim I.

329. An officer may be liable under 1983 where he knows that a fellow officer is violating an individual's constitutional rights, has a reasonable opportunity to prevent the harm, and declines to act. *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002); *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

330. To be liable, an officer must have specific knowledge of the violation. *Randall v. Prince George's County*, 302 F.3d 188, 204 n.24 (4th Cir. 2002).

331. Mr. Reece contacted Director Schurmeier about his concerns regarding the investigation and how Ms. Goldman might be using influence over the SBI.

332. Director Schurmeier said that he would get Senior Agent Laws in touch with Mr. Reece.

333. This conversation shows that Director Schurmeier had specific knowledge of all or some of the aforementioned claims.

334. Director Schurmeier had an opportunity to intervene given his position as Director of the SBI.

335. Director Schurmeier knew that the violations continued after Senior Agent Laws's phone call to Mr. Reece.

336. Therefore, Director Schurmeier had specific knowledge of all or some of the violations subject to the claims discussed above, had a reasonable opportunity to intervene, and failed to do so.

337. Therefore, Director Schurmeier is liable for failing to intervene to stop a violation of 1983.

338. Director Schurmeier getting Senior Agent Laws involved despite him being a subject of Mr. Reece's complaints creates an inference that Director Schurmeier acted intentionally, malicious, or with reckless and callous indifference.

339. Therefore, punitive damages are appropriate.

340. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

341. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

342. Therefore, emotional distress damages are appropriate for this claim.

**P. Claim XII**

Senior Agent Laws Violated 1983 by Failing to Intervene

343. Mr. Reece restates and realleges 1-342 as though stated herein.

344. The elements of a 1983 claim are stated above in Claim I.

345. The requirements for punitive damages under 1983 are stated above in Claim I.

346. The requirements of an emotional distress claim are stated above in Claim I.

347. The elements for liability for failing to intervene are stated above in Claim XI.

348. Mr. Reece contacted Director Schurmeier about his concerns regarding the investigation and how Ms. Goldman might be using influence over the SBI.

349. Director Schurmeier said that he would get Senior Agent Laws in touch with Mr. Reece.

350. This conversation shows that Senior Agent Laws had specific knowledge of all or some of the aforementioned claims.

351. Senior Agent Laws also had specific knowledge due to being copied on emails relating to these events.

352. Senior Agent Laws had an opportunity to intervene given his position as a Senior Agent in Charge.

353. Not only did he decline to fix any of these issues, but he called Mr. Reece and told him not to contact Director Schurmeier, another official in the position to intervene, again.

354. The Court may also infer that Senior Agent Laws had an affirmative reason to decline to act because he had leftover resentment for Mr. Reece based on Mr. Reece's refusal to testify in a case Mr. Reece believes Senior Agent Laws was hoping to use to advance his career by getting three high-ranking state officials.

355. Therefore, Senior Agent Laws had specific knowledge of all of some of the violations subject to the claims discussed above, had a reasonable opportunity to intervene, and failed to do so.

356. Therefore, Senior Agent Laws is liable for failing to intervene to stop a violation of 1983.

357. Senior Agent Laws's threatening language and prior connection to Mr. Reece create an inference that he acted intentionally, malicious, or with reckless and callous indifference.

358. Therefore, punitive damages are appropriate.

359. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

360. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

361. Therefore, emotional distress damages are appropriate for this claim.

**WHEREFORE**, Mr. Reece prays that the Court:

1. Grant that these claims be tried by a jury.

2. Determine that DA Horner deprived Mr. Reece of his rights to property and due process in violation of 1983.

3. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

4. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

5. Determine that Agent Hawks, ADA Leach, and DA Horner violated the Fourth Amendment by imprisoning him on the basis of falsified evidence in violation of 1983.

6. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

7. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

8. Determine that Agent Hawks, ADA Leach, and DA Horner all committed a civil conspiracy under 1983 to commit the aforesaid violation of the Fourth Amendment.

9. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

357. Senior Agent Laws's threatening language and prior connection to Mr. Reece create an inference that he acted intentionally, malicious, or with reckless and callous indifference.

358. Therefore, punitive damages are appropriate.

359. Mr. Reece's PTSD and/or other trauma-induced disorders directly resulted from DA Horner's violation and other violations.

360. Mr. Reece can prove causation and damages through the evidence of his fear of the grand jury, the police, and being outside his home.

361. Therefore, emotional distress damages are appropriate for this claim.

**WHEREFORE**, Mr. Reece prays that the Court:

1. Grant that these claims be tried by a jury.

2. Determine that DA Horner deprived Mr. Reece of his rights to property and due process in violation of 1983.

3. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

4. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

5. Determine that Agent Hawks, ADA Leach, and DA Horner violated the Fourth Amendment by imprisoning him on the basis of falsified evidence in violation of 1983.

6. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

7. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

8. Determine that Agent Hawks, ADA Leach, and DA Horner all committed a civil conspiracy under 1983 to commit the aforesaid violation of the Fourth Amendment.

9. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

10. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

11. Determine that DA Horner violated Mr. Reece's right to freedom of speech by pursuing this prosecution to retaliate for Mr. Reece's plans to have a book written about his experiences with the criminal justice system

12. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

13. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

14. Determine that DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks all violated Mr. Reece's rights to freedom of speech and due process by attempting to thwart Mr. Reece's efforts to settle the ring matter with USAA.

15. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

16. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

17. Determine that DA Horner, ADA Leach, ADA Bollinger, and Agent Hawks all committed tortious interference with contract by intentionally interfering with settlement negotiations and preventing USAA from accepting a reasonable contract offer that it would have accepted, but for their interference, and acted with the intent to injure Mr. Reece.

18. Determine that Mr. Reece has suffered damages in excess of $30,000 as a result of this violation.

19. Determine that ADA Bollinger violated due process and the Fourth Amendment by presenting false evidence at the *Alford* Hearing

20. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

21. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

22. Determine that DA Horner, ADA Bollinger, and ADA Leach all committed a civil conspiracy under 1983 to commit the aforesaid due process and Fourth Amendment violation.

23. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

24. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

25. Determine that DA Horner's threat against Mr. Reece pursuing his claim to recover the ring violated Mr. Reece's Due Process right to seek a motion for appropriate relief.

26. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

27. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

28. Determine that Director Schurmeier violated 1983 by failing to intervene.

29. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

30. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

31. Determine that Senior Agent Laws violated 1983 by failing to intervene.

32. Determine that Mr. Reece has suffered damages in excess of $50,000 as a result of this violation.

33. Grant punitive damages to Mr. Reece in excess of $50,000 as a result of this violation.

34. Grant any further legal and equitable relief as the Court may deem just and proper.

This the 21 day of July, 2023

Kevin Ray Reece, *pro se*

Kevin Ray Reece,
685 Factory Street, Ronda, NC 28685

40